**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| **LAKES GAS CO.,** | |
| **Plaintiff/Counterclaim Defendant,** | **No. C09-2016** |
| **vs.** | **ORDER FOR JUDGMENT** |
| **LOU'S LP CO.,** | |
| **Defendant/Counterclaimant.** | |

---

**TABLE OF CONTENTS**

I.     *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL HISTORY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   *RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.    *The Parties*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.    *David Stevenson*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      C.    *Transactions Prior to 2008*. . . . . . . . . . . . . . . . . . . . . . . . . 4
            1.    *Prepaid Contracts*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
            2.    *Rack Purchases*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            3.    *Product Transfer Orders*. . . . . . . . . . . . . . . . . . . . . . 7
      D.    *Transactions in 2008*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            1.    *Prepaid Contracts*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            2.    *Rack Purchases*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   *DISCUSSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      A.    *Lakes' Amended Complaint*. . . . . . . . . . . . . . . . . . . . . . . . 11
            1.    *Rack Purchases*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.    *Attorney Fees*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      B.    *Lou's Counterclaim*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.     *SUMMARY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.   *ORDER*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# I. INTRODUCTION

On the 1st day of June 2010, this matter came on for trial on the Amended Complaint (docket number 16) filed by the Plaintiff on June 30, 2009, and the Counterclaim (docket number 6) filed by the Defendant on March 23, 2009. The Plaintiff was represented by attorneys Anna Rybicki and Matthew L. Preston. The Defendant was represented by attorney John L. McKinney.

## II. PROCEDURAL HISTORY

On February 25, 2009, Plaintiff Lakes Gas Co. ("Lakes") filed a complaint seeking damages from Defendant Lou's LP Co. ("Lou's") for breach of written contract (Count I) and on an "action for the price" (Count II). On March 23, 2009, Lou's filed an answer, denying it owes Lakes on its claims, and asserting a counterclaim. Lakes responded to the counterclaim on April 9, 2009. On June 30, 2009, Lakes amended its complaint to include a claim for attorney fees.

On January 28, 2010, Lakes filed a motion for summary judgment, asking that it be awarded judgment on its claims, and asking that Lou's counterclaim be summarily dismissed. On March 26, 2010, the Court entered its ruling, granting the motion in part and denying the motion in part. Specifically, the Court found that Lakes was entitled to summary judgment on its claim that Lou's breached three contracts for the purchase of liquid propane in the fall of 2008. The Court ordered that judgment enter in favor of Lakes and against Lou's in the amount of $1,100,778.29. *See* docket number 23. The Court found a genuine issue of material fact, however, regarding whether Lakes was entitled to judgment for "rack purchases" of LP gas, and whether Lou's was entitled to recover on its counterclaim. Accordingly, those issues were reserved for trial.

## III. RELEVANT FACTS

### A. The Parties

Plaintiff Lakes Gas Co. is a supplier of liquid propane ("LP"), based out of Minnesota. Lakes sells LP gas on both a retail and wholesale level, and has approximately

2

75,000 customers. North America Energy ("NAE") is apparently a division of Lakes. In the Final Pretrial Order, the parties agreed that North American Energy and/or Lakes Gas Co. may be referred to as Lakes.[1]

Defendant Lou's LP Co. is an Iowa corporation owned and operated by Louis Harrington and his wife, Shelly Harrington. Lou's purchases LP gas from wholesale suppliers, such as Lakes, and resells it to customers in the Nashua, Iowa, area. Lou's began operating in 1997 as a sole proprietorship, and was incorporated on July 1, 2006.

### B. David Stevenson

The dispute in this case arises from the wrongful actions of David Stevenson. In 1993, Stevenson started Ray's Energy to sell propane on the wholesale market. Louis Harrington, president of Lou's, testified that Lou's started purchasing LP gas from Ray's Energy in 2001 or 2002. According to Harrington, it is good business practice to have two or three sources of LP gas to resell, somebody gave him Stevenson's phone number, and he contacted Stevenson. Later, when Lou's LP submitted a credit application (Plaintiff's Exhibit 13) to Lakes on May 8, 2003, Harrington listed Dave Stevenson and Ray's Energy as a "trade reference."

Lakes also had dealings with Stevenson when he was doing business as Ray's Energy. When Ray's Energy went out of business in 2003, it owed Lakes approximately $2-3 million. Howard Sargeant, president of Lakes, testified that he decided to contract with Stevenson as an independent sales representative, in an effort to recoup some of Lakes' loss. According to Sargeant, he questioned Stevenson's ability as a businessman, but believed that he could perform adequately as an independent sales representative. Sargeant knew that Stevenson had a substantial number of customers, and Lakes was hoping to gain that business.

---

[1] The parties' proposed final pretrial order refers to "North American Energy," while the contracts, invoices, and remaining documentation refers to "North America Energy." The Court assumes the latter is correct.

On August 5, 2003, Stevenson and Lakes executed a "Sales Rep Agreement." *See* Defendant's Exhibit N. At about that time, Stevenson contacted Harrington and told him that Lakes had hired him as a sales representative and that all of the LP gas sold by Lakes in Iowa would be "run through him." Harrington knew that Stevenson was paid on commission. In the Final Pretrial Order, the parties stipulated that Stevenson incorporated Summit Propane Co. ("Summit") in 2004.

### C. Transactions Prior to 2008

As set forth above, Lou's started purchasing LP gas from Dave Stevenson, doing business as Ray's Energy, in 2001 or 2002. After Ray's Energy stopped doing business in 2003 and Stevenson began working as a sales representative for Lakes, Lou's continued to purchase LP gas from Stevenson and/or Summit. Harrington was "unaware" of Lakes until Stevenson became associated with Lakes in 2003. Harrington testified that Lou's purchased 60 to 70 percent of its LP gas through Summit. According to Harrington, Lou's paid Summit, Summit paid Lakes, and Lakes delivered the gas.

### 1. Prepaid Contracts

In 2005, Lou's signed eight contracts with Summit for the delivery of 1,575,000 gallons of LP gas. *See* Defendant's Exhibit Y at 1-8. The contracts called for delivery of the LP between April 2005 and April 2006.[2] Louis Harrington testified that it is common to enter into contracts for the delivery of LP gas in the future, in order to "lock in" the price. Most of the contracts were prepaid or called for payment upon receipt of the invoice; while one contract required 20% down and the balance within 10 days after the product was "pulled." According to Harrington, Lou's was able to secure the best price by prepaying the full amount and, since interest rates were low, it made business

---

[2] On May 16, 2006, Lou's executed another contract for the delivery of 250,000 gallons of LP during July and August 2006. *See* Defendant's Exhibit Y at 9. Lou's was required to pay "100% down" by May 31, 2006.

sense to do so.[3] Harrington testified that he believes that the gas delivered pursuant to the 2005 contracts with Summit was provided by Lakes. However, Lou's could not provide any invoices, bills of lading, or other documentation showing that Lakes delivered gas pursuant to Lou's 2005 contracts with Summit. Jane Boyer, the accounting supervisor at Lakes, testified that she searched the records and could find no evidence that Lakes was involved in the delivery of the gas represented by the contracts between Summit and Lou's in 2005.

Lou's introduced two letters from Lakes, dated August 11 and 12, 2005, each referring to a contract for the sale of 150,000 gallons of propane, and requesting that Lou's return a copy of the invoice and its down payment of $15,000 "to our office."[4] The Court notes that none of the prepaid contracts between Lou's and Summit in 2005 (Defendant's Exhibit Y) refer to 150,000 gallons of propane, or call for a $15,000 down payment. Neither party offered the contracts or invoices referred to in the August 11 and 12, 2005, letters, but they are apparently unrelated to the contracts between Lou's and Summit in 2005.

Lakes sent a similar letter to Lou's on January 26, 2007.[5] The letter refers to the "enclosed contract" for the sale of 630,000 gallons of propane, and asks Lou's to return "to our office" copies of the contract and invoice, and the down payment of $126,000. The contract and invoice corresponding to the January 26, 2007 letter were introduced as Defendant's Exhibit X at 1-2. The "wholesale supply contract," which is on an NAE form, was signed by Louis Harrington on January 3, 2007 and Patricia Balfanz, a representative of Lakes, on January 26, 2007. Dave Stevenson's name is also handwritten

---

[3] Jane Boyer, the accounting supervisor at Lakes, testified that only rarely did Lakes require a customer to pay the full amount in advance. According to Boyer, it was only done on a couple of occasions when the customer did not have a good credit record.

[4] *See* Defendant's Exhibit O at 1-2.

[5] *See* Defendant's Exhibit O at 3.

on the line designated "Sales Representative." The contract is for the sale of 630,000 gallons of propane, with delivery in October-December 2007. The price was 95.5 cents per gallon, with Lou's required to pay 20 percent down ($126,000).[6] The invoice, which was also on an NAE form, directed Lou's to remit the down payment to NAE. On February 20, 2007, Lou's issued a check to Summit Propane for $126,000. *See* Defendant's Exhibit X at 3. Lakes is not suing for payment on this transaction, and the Court assumes Summit forwarded the payment to Lakes. Apparently, Lakes delivered the propane in the fall of 2007 and Lou's paid the balance owed on the contract. The record is silent, however, regarding whether Lou's paid the balance to Summit or Lakes.

### 2.    *Rack Purchases*

While persons in the LP gas business often enter into contracts for the delivery of gas in the future, it is also common for the parties to engage in "rack purchases." On these occasions, a customer (such as Lou's) contacts a representative of the wholesaler (such as Lakes). Here, Lou's would contact Stevenson and ask for the cost of buying a certain number of gallons of LP gas. Stevenson would then call Lakes for the price, and identify the purchaser. Howard Sargeant would authorize the sale at a certain price and a record would be made on an internal order sheet. Stevenson would then contact Lou's and confirm the sale. That is, there would be no written contract between Lou's and Lakes.

On rack purchases, Lakes would contact the pipeline terminal in New Hampton, Iowa, and place gas in the name of Clark Oil. Lou's would then arrange for a trucking company to haul the LP gas from the pipeline terminal in New Hampton to Lou's storage facility in Nashua. A bill of lading would be given to the truck driver, for delivery to the

---

[6] By the Court's calculation, the total cost of the contract would be $601,650 (630,000 x $.9550). Accordingly, it would appear that the down payment should have been $120,330 ($601,650 x .20).

customer (Lou's). The next day, Lakes would check on the deliveries made at the various terminals. An invoice for the sale is then prepared and mailed to the customer.

### 3. *Product Transfer Orders*

During 2006, Lou's also paid for a substantial number of product transfer orders ("PTOs"). According to Jane Boyer, PTOs generally do not involve the actual delivery of LP gas. While it is not entirely clear to the Court, customers could apparently purchase propane from Lakes and then resell it, without taking actual delivery.

Plaintiff's Exhibits 16 and 17 reflect PTO transactions by Lou's from December 31, 2005 to December 22, 2006. Louis and Shelly Harrington testified that Lou's received invoices from Lakes for LP gas which they had not ordered. Lou's would borrow against its credit line at the bank and send a check to Lakes to pay the invoice. Within a few days, Stevenson would then reimburse Lou's for the amount on the invoice, plus "a couple of hundred dollars." The records reflect that Lou's paid Lakes $14,223,940.87 for PTO purchases, and was reimbursed $14,240,484.95 by Stevenson.[7] That is, the amount reimbursed by Stevenson exceeded by $16,544.08 the amount paid by Lou's. According to Shelly Harrington, however, Lou's paid its lender $12,202 in interest for amounts borrowed to pay the PTO invoices. Accordingly, the "profit" to Lou's for participating in the transactions was $4,342.08.

In 2007, Lou's continued to receive PTO invoices from Lakes for LP gas which it had not ordered. By this time, however, Louis and Shelly Harrington had decided that Lou's would no longer pay the invoices and accept reimbursement by Stevenson. According to "cash sheets" and wire transfer records introduced by Lou's, Summit started

---

[7] At the time of trial, it was established that Exhibit 16 fails to include an additional payment by Lou's to Lakes on September 21, 2006, and includes an arithmetical error at the entry on December 8, 2006. The figures cited by the Court reflect the adjusted amounts after the corrections.

paying the PTOs directly, ostensibly on Lou's behalf. *See* Defendant's Exhibits P-W.[8]
The payments in 2007 totaled several million dollars. In 2008, after Stevenson's dishonest
activity was uncovered, the balance owed on the PTOs was $728,000. According to
Howard Sargeant, he told Louis Harrington that Lakes did not expect Lou's to pay that
amount since no gas was actually transferred. Based on the PTO transactions, it seems to
the Court that both parties had fair warning of Stevenson's propensity for shady dealings.

### D. Transactions in 2008

#### 1. Prepaid Contracts

Louis Harrington testified that on February 29, 2008, he reached an oral agreement
with Dave Stevenson for the purchase of 100,000 gallons of LP gas at $1.44 per gallon.
The entire purchase price of $144,000 was prepaid, as reflected in a wire transfer report
dated February 29, 2008. *See* Defendant's Exhibit A. No written contract was prepared.
The "beneficiary" of the wire transfer was Summit Propane, with the money sent to its
bank in Marion, Iowa. According to Louis Harrington, Lou's started "pulling" LP
pursuant to the agreement, but stopped midway through because the price was "locked in"
and Lou's could obtain the gas at a lower "rack price."

Between March 25, 2008 and July 23, 2008, Lou's entered into eight additional
prepaid contracts with Summit Propane. *See* Defendant's Exhibits B-I. The name
"SUMMIT PROPANE" appears at the top, together with a Cedar Rapids, Iowa address.
The contracts, which are identical in form, state:

> This confirms the following transaction made between
> <u>SUMMIT PROPANE & LOU'S L.P.</u> under the following
> terms and conditions.

The capitalization and underlining appear in the contracts. Each of the contracts is signed
by Lou Harrington as president of Lou's LP. The other signature line refers to "SUMMIT

---

[8] Apparently, Lou's "regular" purchases of LP gas were recorded under account
number 1602, while the PTOs were recorded under account number 1603.

PROPANE," and is signed by David Stevenson. The details of the contracts may be summarized in table form as follows:

| DATE | QUANTITY (gallons) | PRICE | TERMS OF PAYMENT | SHIPMENT DATE | INVOICE AMOUNT |
|---|---|---|---|---|---|
| 3/25/08 | 81,000 | 1.40 | Wire net on receipt | 9/30/08 thru 3/31/09 | $113,400. |
| 4/2/08 | 100,000 | 1.40 | Wire net on receipt | 9/30/08 thru 3/31/09 | 140,000. |
| 4/3/08 | 50,000 | 1.40 | Wire net on receipt | 10/1/08 thru 3/31/08 [sic] | 70,000. |
| 4/9/08 | 50,000 | 1.51 | Wire net on receipt | 30 days | 75,500. |
| 4/15/08 | 50,000 | 1.51 | Wire net on receipt | 30 days | 75,500. |
| 4/15/08 | 50,000 | 1.51 | Wire net on receipt | 30 days | 75,500. |
| 5/19/08 | 81,000 | 1.65 | Wire net on receipt | 30 days | 133,650. |
| 7/23/08 | 105,000 | 1.725 | Wire net on receipt | 30 days | 181,125. |

For each of the eight contracts (except the last), Summit Propane sent an invoice to Lou's, referencing the amount of propane shown on the contracts, the unit price, and the total purchase price. *See* Defendant's Exhibits B-H, at 2. Lou's then sent the full purchase price to Summit Propane at its bank in Marion, Iowa. *See* Defendant's Exhibits B-I, at 3. For the eight contracts listed above, Lou's paid Summit a total of $864,675. It is undisputed that Summit did not pay any of that amount to Lakes. In fact, Lakes claims that it had no knowledge of the contracts until Stevenson filed for bankruptcy early

9

in August 2008 and Lou's called Lakes. None of the LP gas which was prepaid by Lou's was ever delivered.[9]

### 2. *Rack Purchases*

In addition to the prepaid contracts for the delivery of LP gas in the future, the parties stipulated at the time of trial that "Lou's pulled LP from Lakes" in July, August, and October 2008. Those "rack purchases" are reflected by Plaintiff's Exhibits 1-9, and may be summarized in table form as follows:

| DATE | QUANTITY | PRICE | TOTAL** |
|---|---|---|---|
| 7/24/08 | 9,400 | 1.7725 | $16,717.90 |
| 7/24/08 | 9,398 | 1.7725 | 16,714.35 |
| 7/30/08 | 8,799 | 1.7325 | 15,297.07 |
| 7/30/08 | 8.998 | 1.7325 | 15,643.03 |
| 7/31/08 | 8,918 | 1.7125 | 15,325.59 |
| 7/31/08 | 9,399 | 1.7125 | 16,152.19 |
| 8/1/08 | 9,399 | 1.7125 | 16,152.19 |
| 8/1/08 | 9,398 | 1.7125 | 16,150.47 |
| 10/30/08 | 6,055 | 1.0925 | 6,615.09 |

** The "total" price includes federal and state fees.

---

[9] It should be recalled that on September 2, 2008, after learning that Lakes was unaware of the prepaid contracts with Stevenson/Summit, Lou's contracted directly with Lakes for the purchase of 750,000 gallons of liquid propane to be delivered between October 2008 and February 2009. *See* Plaintiff's Exhibits 10-12. After accepting delivery of nearly all of the LP, however, Lou's failed to pay on the contracts. Accordingly, the Court has previously entered judgment in favor of Lakes and against Lou's in the amount of $1,100,778.29, plus interest. *See* docket number 23.

The parties stipulated that the charges for the rack purchases, as set forth above, total $134,767.88. Lou's paid Summit Propane $114,619.09 on July 31, 2008. *See* Defendant's Exhibit K at 3. Summit Propane did not send any payment to Lakes. Lakes claims that Lou's continues to owe it the entire amount of $134,767.88. Lou's claims that it should receive credit for the amount paid to Summit Propane, but admits that it owes the balance of $20,148.79.[10]

## IV. DISCUSSION

In that part of its amended complaint not disposed of by summary judgment, Lakes asks that judgment enter against Lou's for the rack purchases made from July 24, 2008 through August 1, 2008, and October 30, 2008.[11] In addition, Lakes asks for an award of attorney fees. In its counterclaim, Lou's asks that judgment be entered against Lakes in the approximate amount of $910,723, representing payments made by Lou's to Summit on prepaid contracts entered into between February 2008 and July 23, 2008, for LP gas which was never delivered.

### A. Lakes' Amended Complaint

#### 1. Rack Purchases

It is undisputed that Lou's "pulled LP" from Lakes pursuant to rack purchases in late July 2008, and again in late October 2008. The parties stipulated that the charges for those rack purchases total $134,767.88. Lakes has not received any payment for that LP gas. Lou's argues, however, that it should receive credit for $114,619.09 paid to Summit Propane on July 31, 2008. Lou's concedes that it owes the balance of $20,148.79.

---

[10] From August 19 to September 17, 2008 – after Summit Propane filed for bankruptcy protection – Lou's made ten additional rack purchases from Lakes of 94,460 gallons of LP at a total cost of approximately $144,057. *See* Defendant's Exhibit K at 4-13. Lou's paid Lakes for those purchases, however, and they are not part of this litigation.

[11] The dates used by the Court are those reflected on the invoices (Plaintiff's Exhibits 1-9). According to Jane Boyer, Lakes' accounting supervisor, the actual deliveries would have occurred a day or two earlier.

In short, Lou's claims that making payment to Summit Propane was the same as paying Lakes. That is, Lou's argues that Summit had apparent authority to accept payment on Lakes' behalf for the sale of LP gas. Lakes denies that Summit had such authority.

"Apparent authority is authority which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing." *Magnusson Agency v. Public Entity Nat. Company-Midwest*, 560 N.W.2d 20, 25-26 (Iowa 1997) (citations omitted). Therefore, apparent authority is determined by "what the principal does, rather than by any acts of the agent." *Id.* at 26 (citation omitted). *See also Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 493 (Iowa 2000) (same).

> [T]he rule is that if a principal acts or conducts his business either intentionally, or through negligence, or fails to disapprove of the agents' act or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principle, such principle is bound by the acts of the agent within the scope of his apparent authority as to any person who, upon the faith of such holding out, believes, and has reasonable ground to believe, that the agent has such authority, and in good faith deals with him.

*State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977) (quoted with approval in *Rogers v. Energy Panel Structures, Inc.*, 2007 WL 2257566 (Iowa App.) at *4). *See also Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 711 (Iowa 1985) ("For apparent authority to exist, the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority."). "[T]he burden of showing that an agent acted within the scope of the agent's actual or apparent authority is on the party claiming that such authority existed." *Waukon Auto Supply v. Farmers & Merchants Savings Bank*, 440 N.W.2d 844, 847 (Iowa 1989) (citation omitted).

As set forth above, Lou's paid Summit Propane $114,619.09 on July 31, 2008, for LP pulled from Lakes pursuant to rack purchases. According to Lou's, it paid Summit pursuant to a longstanding practice in which it paid Summit, Summit paid Lakes, and

Lakes delivered the gas. Lakes notes that the invoices issued by NAE on the rack purchases directed Lou's to make payment to North America Energy, and argues that any understanding by Lou's regarding payment to Summit was not the result of actions taken by Lakes.

The transaction in January 2007, however, reflects that Lakes knew or should have known that Lou's was paying Summit directly on the purchase of LP from NAE. In a letter to Lou's dated January 26, 2007, NAE refers to a contract and invoice for the sale and purchase of 630,000 gallons of propane.[12] The letter directs Lou's to return copies of the contract and the invoice "along with your down payment of $126,000." The contract identifies Lou's as the buyer and North America Energy as the seller.[13] The invoice from NAE directs Lou's to mail its remittance to NAE.[14] The check from Lou's shows, however, that payment was made to Summit Propane.[15] Accordingly, notwithstanding the terms of the contract and invoice, Lou's paid Summit Propane, rather than paying NAE directly. NAE apparently received and accepted payment, and did not notify Lou's that payment should be made directly to NAE, rather than to Summit Propane.

Even more significantly, the practice of Lou's paying Summit for the rack purchase of LP gas from Lakes continued in the spring of 2008. According to two "motor truck bill[s] of lading," on April 16, 2008, Lou's pulled 9,484 gallons of LP gas from Lakes and, later in the day, pulled an additional 9,545 gallons of LP gas.[16] In two invoices dated the same date, North America Energy billed Lou's $15,207.59 and $15,305.42 for the two

---

[12] *See* Defendant's Exhibit O at 3.

[13] *See* Defendant's Exhibit X at 1.

[14] *See* Defendant's Exhibit X at 2.

[15] *See* Defendant's Exhibit X at 3.

[16] *See* Defendant's Exhibit Z at 4-5.

loads, respectively.[17] In a check dated May 1, 2008, Lou's paid Summit Propane $30,513.01, representing payment of the two invoices from NAE. Lakes has not sued for recovery on these transactions, and the Court assumes that Lakes received payment from Summit Propane.

Similarly, on May 2, 2008, Lou's pulled 9,027 gallons of LP gas from Lakes at the New Hampton terminal.[18] In an invoice dated on the same date, North America Energy charged Lou's $14,655.34.[19] In a check dated May 20, 2008, Lou's paid that amount to Summit Propane.[20] Again, this transaction is not part of Lakes' claim and, therefore, the Court assumes that Summit Propane sent the payment on to Lakes.

As a consequence of Lakes' failure to complain or otherwise notify Lou's that payment to Summit Propane was unacceptable, Lou's could reasonably believe that payment to Summit Propane complied with the terms of its contract with Lakes. *State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977) (establishing apparent authority when a principal "acts or conducts his business either intentionally, or through negligence, or fails to disapprove of the agents' act or course of action so as to lead the public to believe that his agent possesses authority to act . . ."). The Court concludes that Lou's has met its burden of proving that Summit Propane had apparent authority to accept payment from Lou's on its contracts to purchase LP gas from Lakes. Therefore, Lakes is charged with the $114,619.09 which Lou's paid to Summit Propane on July 31, 2008. Lou's concedes that it owes the balance of $20,148.79 for the rack purchases in late July and late October 2008, and judgment will enter in favor of Lakes and against Lou's for that amount.

---

[17] *See* Defendant's Exhibit Z at 2-3.

[18] *See* Defendant's Exhibit Z at 7.

[19] *See* Defendant's Exhibit Z at 6.

[20] *See* Defendant's Exhibit Z at 1.

## 2. *Attorney Fees*

Next, Lakes claims that it is entitled to an award of attorney fees. In support of its claim, Lakes relies on the wholesale supply contracts (Plaintiff's Exhibits 10, 11, and 12) executed by the parties on September 2, 2008, and language found in a credit application (Plaintiff's Exhibit 13) signed by Louis Harrington on May 8, 2003.

On March 26, 2010, the Court found that Lakes was entitled to summary judgment against Lou's on the contracts for the sale of LP gas, signed on September 2, 2008. *See* docket number 21. After interest was calculated, the Court ordered judgment in favor of Lakes and against Lou's in the amount of $1,100,778.29. *See* docket number 23. The Court did not address the issue of attorney fees at that time.

In claiming its right to attorney fees, Lakes relies on the following term from the wholesale supply contracts:

> **INDEMNIFICATION:** Buyer shall agree to defend, indemnify, and hold Seller harmless from any and all claims, suits, liabilities, proceedings, losses and expenses arising in connection with Buyer's performance of this agreement.

*See* Plaintiff's Exhibits 10-12, at 2.

By the contracts' plain language, Lou's agrees to defend, indemnify, and hold Lakes harmless from any claims, losses and expenses arising in connection with Lou's performance of the agreement. Notably, the wholesale supply contracts lack the language which is commonly found in contracts, providing that if a party is required to file suit in order to enforce its rights under the contract, then the other party is required to pay the costs associated with that legal action. Nonetheless, Lakes claims that the indemnification provision found in the contract allows it to recover attorney fees and expenses here.

In support of its claim, Lakes cites *Litton Microwave Cooking Products v. Leviton Mfg. Co., Inc.*, 15 F.3d 790 (8th Cir. 1994) and *Fortune Southfield Co. v. Kroger Co.*, 931 F. 2d 1282 (8th Cir. 1991). The Court believes, however, that Lakes' reliance on these cases is misplaced.

15

Litton manufactured microwave ovens. It purchased electrical switch components from Leviton. Litton began to receive reports of fires and smoking in some of its microwave ovens, which it traced to a change in Leviton's manufacturing process that caused the switches to arc and smoke. *Litton*, 15 F.3d at 792. Litton instituted a program to replace the defective fan switches and sued Leviton. One of the issues addressed by the Court was whether Litton was entitled to an award of attorney's fees under the terms of the purchase order. The relevant clause of the purchase order provided:

> Seller agrees to indemnify Litton and such purchasers [purchasers of Litton's products] from all liability, loss, costs and expense, including reasonable attorney's fees, resulting from any breach of any or all said warranties, express or implied.

*Id.* at 795. Leviton argued that "the clause limits Litton's recovery of attorney fees to those circumstances where attorney fees are incurred while defending claims brought against the party seeking indemnity by a third party." *Id.* at 795-96. That is, Litton argued that "an award should not be made for fees and expenses incurred in establishing the right to indemnity." *Id.* at 796.

Citing Minnesota law, the Eighth Circuit Court of Appeals rejected the argument urged by Leviton.[21] The Court focused on the word "indemnify," and concluded that it means to protect against loss or damage, exempt from liability, or make compensation for loss or damage. The Court found that the construction urged by Leviton "would produce the odd result of paying Litton's attorney's fees if, but only if, Litton waited to be sued by consumers for the damage resulting from the breach of warranty." *Id.* at 796. Since Leviton had agreed to indemnify Litton against losses, including reasonable attorney fees, resulting from breach of warranty, the Court concluded that Litton was entitled to attorney fees in its direct action against Leviton.

---

[21] The parties in the instant action apparently agree that pursuant to the terms and conditions of the wholesale supply contract, Minnesota law is applicable to this issue. *See* Plaintiff's Exhibits 10-12 at 2.

Similarly, the dispute in *Fortune Southfield* also involved a claim for attorney fees incurred in establishing the defendant's duty of indemnification. *Fortune Southfield*, 931 F.2d at 1284. The Court concluded that under the clear and unambiguous language of the contract, the defendant agreed to indemnify and hold harmless the third-party defendant from any loss or expenses, including reasonable attorney fees, arising from the contract between defendant and the third-party defendant. *Id*. In other words, both *Litton* and *Fortune Southfield* involved actions to establish the right of indemnification against claims by third parties. They have no application here.

The facts in the instant action are easily distinguishable. Here, Lakes did not sue Lou's because of any potential liability to third parties. In the indemnification clause of the wholesale supply contracts, Lou's agreed to "defend, indemnify, and hold Seller harmless" from any claims arising from Lou's performance of the agreement. As noted by the Court in *Litton*, the common definition of "indemnify" is to protect against loss or damage. 15 F.3d at 796. Here, the parties' use of the terms "defend" and "hold harmless" reinforces the Court's view that the indemnification clause was intended to protect Lakes against claims by third parties. If Lakes intended to recover its attorney fees for any breach of contract by Lou's, it could have easily included language to that effect in the contract. Lakes' argument that attorney fees may be awarded under these circumstances pursuant to the indemnification clause of the wholesale supply contracts is strained, at best.

The instant case is a straight breach of contract case. Lakes delivered gas to Lou's pursuant to three wholesale supply contracts, and Lou's failed to pay. As a consequence, the Court has ordered that judgment enter in favor of Lakes and against Lou's in the amount of $1,100,778.29. The contracts did not include any language, however, that required Lou's to pay attorney fees associated with an action to recover for breach of contract. Since the dispute does not involve claims by third parties, the indemnification clause of the contracts – wherein Lou's agrees to defend, indemnify, and hold Lakes

harmless from such claims – has no application. Accordingly, the Court concludes that Lakes is not entitled to attorney fees pursuant to the wholesale supply contracts.

Alternatively, Lakes claims that it is entitled to attorney fees pursuant to language found in the credit application (Plaintiff's Exhibit 13) signed by Louis Harrington on May 8, 2003. In the fine print at the bottom of the application is the following:

> It is further agreed that a charge of 1.5% monthly on the unpaid balance will be charged on amounts not paid within terms stated on invoice, and I/we will pay any and all cost to collect on the account including attorney fees.

*See* Credit Application (Plaintiff's Exhibit 13).

Even if the Court finds that the credit application constitutes a legally binding agreement between the parties, it provides no relief to Lakes here. Clearly, Lakes is the prevailing party on its claim for breach of contract relating to the wholesale supply contracts. The Court believes, however, that Lakes' entitlement to recover attorney fees on that dispute must be found within the terms of the wholesale supply contracts. As set forth above, the wholesale supply contracts do not provide for recovery of attorney fees in a straight breach of contract action.

Arguably, the provision found in the credit application for recovery of attorney fees may have application to Lou's "rack purchase" of LP gas from Lakes. On its claim in this regard, however, Lakes was largely unsuccessful. As set forth above, Lakes is entitled to judgment for only that amount which Lou's conceded that it owes prior to trial. After carefully considering all of the facts and circumstances, the Court concludes that Lakes is not entitled to recover any attorney fees.

### B. Lou's Counterclaim

Lou's counterclaim is based on LP gas which it paid for, but was never delivered. Lou Harrington testified that the first transaction giving rise to the counterclaim is an oral agreement between himself and David Stevenson, as represented by the wire transfer report introduced at trial as Defendant's Exhibit A. According to Harrington, Lou's

agreed to purchase 100,000 gallons of LP gas at $1.44 per gallon, for a total of $144,000. Lou's wired payment to Summit Propane in that amount on February 29, 2008. Lou's started pulling gas on the contract "right away," but after talking to Stevenson decided to "stop pulling this contract being that the price was locked in and save that for future use and then to start pulling rack gas because that would be cheaper." According to Harrington, Lou's has not received 31,978 gallons of LP included in the transaction reflected by Defendant's Exhibit A. At $1.44 per gallon, Lou's claims it's entitled to a refund of $46,048.32.[22]

The remainder of Lou's counterclaim is based on eight prepaid contracts which were introduced as Defendant's Exhibits B-I.[23] Each of the contracts has "SUMMIT PROPANE" at the top, together with the Cedar Rapids address, phone number, and fax number of Summit Propane. Each of the contracts states that it is a transaction "made between SUMMIT PROPANE & LOU'S LP." (Capitalization and underlining in original) The contract is signed by Lou Harrington on behalf of Lou's and by David Stevenson on behalf of Summit Propane. Neither Lakes Gas Company nor North America Energy appear anywhere on the contracts.

With the exception of the last contract, each of the eight written contracts has a corresponding invoice. *See* Defendant's Exhibits B-I at 2. Again, the name, address, and phone numbers of Summit Propane appear at the top and bottom of each invoice. Lou's is instructed on the invoices to wire payment to Summit Propane's account at the Farmers State Bank in Marion, Iowa. As reflected by the wire transfer reports associated with each contract, Lou's paid Summit a total of $864,675. *See* Defendant's Exhibits B-I at 3.

---

[22] On Defendant's Exhibit J, Lou's lists $44,769.20 for this claim, based on $1.40 per gallon. Lou Harrington testified at trial, however, that this was a mistake.

[23] The contracts are dated between March 25, 2008 and July 23, 2008, although it appears that Harrington signed each of them a few days later.

Summit Propane did not send any of the money to Lakes, and none of the LP gas was ever delivered.

In asserting that it is entitled to judgment against Lakes for the payments made to Summit Propane on gas which was not delivered, Lou's argues that "Stevenson/Summit was cloaked under the mantle of apparent authority as that concept is defined in the law."[24] Lakes argues, on the other hand, that the Court need not reach the issue of apparent authority since the contracts which are the basis of Lou's counterclaim were between Lou's and Summit Propane, and did not even purport to bind Lakes to any agreement for the delivery of gas.

The LP gas purchases made by Lou's in 2008 were accomplished in two fundamentally different ways. Between January 10 and March 6, 2008, Lou's purchased approximately 90,000 gallons of LP gas, as represented by ten motor truck bills of lading introduced at trial as Plaintiff's Exhibit 18. The gas was pulled at the New Hampton terminal. The "customer" is identified as Summit Energy, and the "consignee" is identified as Lou's LP.[25] Similarly, the prepaid contracts reflected by Defendant's Exhibits B-I identify Summit Propane as the seller and Lou's LP as the buyer.

In contrast, on April 16, 2008, Lou's pulled two loads of LP gas from the New Hampton Terminal, totaling 19,029 gallons. The motor truck bills of lading identify the "customer" as Lakes Gas Co., with the "consignee" identified as Lou's LP.[26] The

---

[24] *See* Defendant/Counterclaimant's Post-Trial Brief at 3 (docket number 30 at 3).

[25] The record is imprecise regarding whether any of the 90,284 gallons received by Lou's between January 10 and March 6, 2008, were in satisfaction of the oral agreement entered into between Lou Harrington and David Stevenson, as reflected by Defendant's Exhibit A. Lou Harrington testified that Lou's LP received 68,022 gallons of the 100,000 gallons contracted for, but he did not provide any detail regarding when the gas was delivered.

[26] *See* Defendant's Exhibit Z at 4-5.

invoices for these transactions are from North America Energy.[27] Another load of gas was pulled on May 2, 2008, with similar documentation.[28] Similarly, the rack purchases in late July and late October, representing part of Lakes' claim in the instant action, included invoices from North America Energy.[29] The prepaid wholesale supply contracts executed by the parties on September 2, 2008 were on a North America Energy form.[30]

There is no evidence that Lakes had any knowledge of the contracts which were entered into between Lou's and Summit Energy. Lakes' president, Howard Sargeant, and its accounting supervisor, Jane Boyer, both testified that they had no knowledge of the contracts between Lou's and Summit Energy until after David Stevenson filed for bankruptcy protection in August 2008. According to Boyer, there are no records indicating that Lakes was involved in the delivery of the gas purchased by Lou's between January 10 and March 6, 2008. While Louis Harrington testified that he assumed Lakes was the source of the gas, the motor truck bills of lading for those deliveries show that the gas was pulled on Summit Energy's account at the New Hampton terminal, rather than Lakes Gas Co.'s account.[31] On cross-examination, Harrington admitted that "all you really know is that you paid Summit and Summit got gas from somewhere." Simply put, Lakes is not a party to the prepaid contracts which constitute Lou's counterclaim. *See Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 711 (Iowa 1985) (identifying "[s]everal instructive Iowa cases [which] have rejected claims based on an agency theory when the purported agent entered into the contract in the person's own name and not for another").

---

[27] *See* Defendant's Exhibit Z at 2-3.

[28] *See* Defendant's Exhibit Z at 6-7.

[29] *See* Plaintiff's Exhibits 1-9.

[30] *See* Plaintiff's Exhibits 10-12.

[31] *Compare* Plaintiff's Exhibit 18 with Defendant's Exhibit Z.

Furthermore, Lou's cannot rely on the doctrine of apparent authority. There is no evidence that Lakes ever took any action which suggested that it would honor contracts executed between Lou's and Summit Energy. While Lou's introduced copies of prepaid contracts which it entered into with Summit Energy in 2005 (Defendant's Exhibit Y), it failed to provide any evidence that Lakes delivered LP gas pursuant to those contracts, or was even aware of them. Jane Boyer, the accounting supervisor at Lakes, testified that she searched the records and could find no evidence that Lakes was involved in the delivery of the gas represented by the contracts between Summit and Lou's in 2005. Accordingly, it cannot be said that Lakes acted in a manner which would reasonably lead Lou's to believe that Lakes would honor contracts entered into <u>between Lou's and Summit Energy</u>. *See State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977). It should be noted that this is a different issue than the one previously addressed by the Court – whether Lakes had previously acted in a way which suggested that it would accept <u>payments</u> to Summit Energy on contracts <u>between Lakes and Lou's</u>. *See Magnusson Agency*, 560 N.W.2d at 25 (apparent authority is authority "which the principal holds the agent out as possessing"). *See also FS Credit Corp. v. Troy Elevator, Inc.*, 397 N.W.2d 735, 740 (Iowa 1986) (apparent scope of authority is that which "has been knowingly permitted by the principal") (citing *Mayrath Co. v. Helgeson*, 139 N.W.2d 303, 306 (Iowa 1966)).

It is unfortunate that Lou's suffered a loss as a result of Stevenson's deception. Under these circumstances, however, Lakes is not responsible for Stevenson's wrongdoing. Lakes played no role in the prepaid contracts between Summit Energy and Lou's, which give rise to the counterclaim. Accordingly, the counterclaim must be dismissed.

## V. SUMMARY

Lakes' amended complaint is in two parts. Lakes claims entitlement to recover for breach of three wholesale supply contracts executed by the parties on September 2, 2008. The Court has previously ordered that judgment enter in favor of Lakes and against Lou's

on those contracts in the amount of $1,100,778.29. *See* docket number 23. Lakes also claims that it is entitled to judgment for "rack purchases" made by Lou's in late July and late October, 2008. As detailed above, the Court concludes that Lakes is entitled to judgment for those purchases in the amount of $20,148.79. For the reasons stated above, Lakes' claim for attorney fees is denied.

Lou's counterclaim is based on LP gas which it paid for, but was never delivered. As detailed above, the Court concludes that the prepaid contracts which constitute the basis of Lou's counterclaim were between Lou's and Summit Energy. Lakes was not a party to those contracts and bears no legal obligation for those contracts. Lou's has failed to prove that Lakes took any action to lead Lou's to believe that Lakes would honor contracts entered into by Summit Energy. Accordingly, the counterclaim brought by Lou's must fail.

## VI. ORDER

IT IS THEREFORE ORDERED as follows:

1. Judgment shall enter in favor of Plaintiff Lakes Gas Co. and against Defendant Lou's LP Co. in the amount of Twenty Thousand One Hundred Forty-Eight Dollars seventy-nine cents ($20,148.79) plus interest at the federal statutory rate from and after the filing of this Order.

2. The Judgment described in the preceding paragraph is in addition to the Judgment previously ordered by the Court at docket number 23.

3. The claim of Lakes Gas Co. for attorney fees is **DENIED.**

4. The counterclaim filed by Lou's LP Co. is **DENIED**.

DATED this 24th day of August, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA